**In re Richard J. DeSOTO, Antonia M. DeSoto, Debtors.**

**Bankruptcy No. 92–53552.**

United States Bankruptcy Court, D. Connecticut.

May 15, 1995.

Jonathan D. Zabin, Yost & Associates, P.C., New Haven, CT, for trustee.

Timothy D. Miltenberger, Coan, Lewendon, Royston, Deming & Gulliver, New Haven, CT, for debtors.

## MEMORANDUM OF DECISION AND ORDER ON OBJECTION TO NOTICE OF SALE

ALBERT S. DABROWSKI, Bankruptcy Judge.

### I. INTRODUCTION

This contested matter presents a dispute between the Debtors and their Chapter 7 Trustee over control of the shares of stock of a real estate holding corporation. The Debtors have objected to their Chapter 7 trustee's proposed private sale of these shares of stock upon several alternative grounds, including their principal claim that the stock is no longer property of their bankruptcy estate. For the reasons discussed, *infra*, the Court resolves this dispute in favor of the Trustee's power to sell the stock.

### II. JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant contested matter by virtue of 28 U.S.C. § 1334(b); and this Court derives its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. §§ 157(a), (b)(1). This matter is a "core proceeding" pursuant to 28 U.S.C. §§ 157(b)(2)(A), (N) and (O).

### III. FACTUAL BACKGROUND

The Court finds the following material facts from (1) its judicial notice and review of the official public record of this case, (2) the parties' "Stipulation of Facts for Trustee's Notice of Sale" dated September 9, 1994 (hereinafter, the "Stipulation"), and (3) the evidence adduced at the hearing of this matter on September 13, 1994.

The instant bankruptcy case was commenced by the filing of the Debtors' joint voluntary petition on October 27, 1992 (hereinafter, the "Petition Date"). Relief thereon was simultaneously ordered by this Court. Byron Paul Yost (hereinafter, the "Trustee") is the duly qualified and acting trustee of the Debtors' resulting bankruptcy estate(s) (hereinafter collectively referred to as the "Estate").[1] A meeting of creditors pursuant to 11 U.S.C. § 341(a) and Federal Rule of Bankruptcy Procedure (hereinafter, "Fed. R. Bank. P.") 2003(a) was initially held on December 3, 1992, and thereafter adjourned serially to February 24, April 24, May 27, and June 30, 1993, after which the meeting was closed by the Trustee.

The Debtors filed joint and consolidated Schedules to their Petition. In Schedule B the Debtors disclosed as an asset the corporate stock of C.A.M.R., Inc. (hereinafter, the "Stock"), to which they attached a value of "$1.00" coupled with the parenthetical statement "liabilities vastly exceed assets". The Stock was also the subject of a claim of exemption by the Debtors. Their Schedule C again lists the value of the Stock at "$1.00 (liabilities vastly exceed assets)" and claims $1.00 as exempt. The Trustee has not objected to this claim of exemption.

C.A.M.R., Inc. is the owner of an improved parcel of real property commonly known as "The Atrium". As of the Petition Date, the Debtors and C.A.M.R., Inc., *inter alia*, were defendants in a Connecticut Superior Court civil action commenced by Gateway Bank, n/k/a Shawmut Bank, N.A., seeking, *inter alia*, to foreclose upon The Atrium (hereinafter, the "Foreclosure Action"). On or about October 26, 1992, the Connecticut Superior Court appointed a receiver of rents (hereinafter, the "Receiver") for The Atrium.

On April 5, 1993, Gateway obtained a judgment of strict foreclosure in the Foreclosure Action. That judgment was timely appealed by the Debtors and C.A.M.R., Inc. (hereinafter, the "Appeal"), and was reversed by the Connecticut Appellate Division on October

---

1. To date, the Court has not entered a formal order addressing whether, or to what extent, the Debtors' estates should be consolidated pursuant to 11 U.S.C. § 302(b). Because it is beyond dispute that the Trustee was appointed as the representative of whatever DeSoto estate(s) may exist at this time, it is unnecessary for the Court to consider whether such estates were deemed or presumed to be consolidated at an earlier point in this case. Neither is it necessary or appropriate for the Court to address in the context of this contested matter the propriety of consolidation in this case.

19, 1993, based upon the impropriety of certain defaults underlying the judgment. In prosecution of the Appeal, from the Petition Date to September 27, 1993, Debtor Richard DeSoto and C.A.M.R., Inc. incurred obligations to the law firm of Bielizna, Frizzell, Papazoglou, Olivo and Swenson in the amount of $8,198.50, of which sum, $7,298.50 remains due and owing.

On December 20, 1993, C.A.M.R., Inc. filed a pleading titled "Revised and Amended Answer, Special Defense and Counterclaim" in the Foreclosure Action. This pleading was further revised and again filed with the Superior Court on April 19, 1994 (hereinafter, the "Revised Answer"). The Revised Answer states various defenses (hereinafter, the "Defenses") and counterclaims (hereinafter, the "Claims") premised upon the alleged misconduct of Gateway, through its employees and in concert with the Receiver. In connection with its assertion of the Claims and Defenses, C.A.M.R., Inc. has incurred obligations to Attorney Robert A. Ziegler in the amount of $19,465.25, of which only $9,000 has been paid.

On May 26, 1993, Debtor Richard DeSoto subscribed a letter to Gateway on The Atrium letterhead seeking to obtain a $150,000 payment in exchange for, *inter alia,* C.A.M.R., Inc.'s agreement to (1) not assert the Claims and Defenses, and (2) otherwise permit the sale of The Atrium to a buyer identified by Gateway. It is clear that Gateway was, and still is, anxious to obtain title to The Atrium and convey it to a prospective purchaser to facilitate the satisfaction of its mortgage interest therein.

As early as April, but not later than July, 1993, the Trustee was engaged in negotiations with Gateway concerning Gateway's possible purchase of the Estate's interest in the Stock. In July 1993, the Trustee conditionally accepted Gateway's offer of $10,000 for the Stock, and on July 29, 1993, the Trustee filed a Notice of Sale of certain assets, including the Stock (hereinafter, the "July Notice of Sale"). The Trustee did not proceed with a sale of the Stock pursuant to the July Notice of Sale due to a technical defect in that notice. On October 18, 1993, the Trustee filed a new Notice of Sale (hereinafter, the "October Notice of Sale"). By its terms the October Notice of Sale seeks to sell the Stock to Gateway for the sum of $10,000, subject to higher and better offer. The October Notice of Sale prompted the Debtors' objection, which gave rise to this contested matter.

## IV. THE DEBTORS' OBJECTION

The Debtors' objection to the Trustee's October Notice of Sale (hereinafter, the "Debtors' Objection") was originally premised solely upon their assertion that the Stock was no longer property of the bankruptcy estate due to the Trustee's failure to interpose a timely objection to their claim of exemption therein. Later memoranda filed in support of the Debtors' Objection assert as an additional ground for the Debtors' belief that the Stock is no longer an asset of their bankruptcy estate, that all, or substantially all, of the present value of the Stock was created through the post-petition effort and earnings of the Debtors. At the September 13, 1994 hearing of this matter, counsel for the Debtors orally presented argument for a third theory barring the Trustee's sale, namely, that such a sale would constitute a fraudulent conveyance of the assets of C.A.M.R., Inc. to the creditors of the Debtors.

## V. DISCUSSION

### A. Burden of Proof.

■ Since the Debtors' Objection challenges the Trustee's power to sell putative property of the estate under 11 U.S.C. § 363(b), the burden of proof is governed by 11 U.S.C. § 363(o) in the first instance. That subsection provides as follows:

> In any hearing under this section [363]—
>
> (1) the trustee has the burden of proof on the issue of adequate protection; and
>
> (2) *the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest.*

11 U.S.C. § 363(o) (emphasis supplied). Accordingly, as the entity (other than the Trustee) asserting an interest in the subject

property, the Debtors bear the burden of proving to this Court the validity, priority and/or extent of such interest(s).

The Bankruptcy Code's allocation of the burden of proof is supported by the specific Bankruptcy Rules governing this contested matter. Fed.R.Bank.P. 6004(b) states that "[a]n *objection* to ... [a] ... proposed ... sale ... of property is governed by Rule 9014." In other words, the Debtors' Objection, not the Trustee's October Notice of Sale, is deemed to be the "motion" which prayed for relief and commenced the instant contested matter. *See* Fed.R.Bank.P. 9014 ("relief shall be requested by motion"). Thus Section 363(*o*)(2) distributes the burden of proof in a manner consistent with the general rule that a movant bears the burden of proving the basis for the relief requested in its motion. *E.g., In re Flick,* 14 B.R. 912, 914 (Bankr.E.D.Pa.1981); *see, e.g., Maxwell Land–Grant Co. v. Dawson,* 151 U.S. 586, 604, 14 S.Ct. 458, 463, 38 L.Ed. 279 (1894); *Lodge 743, Int'l Ass'n of Mach., AFL–CIO v. United Aircraft Corp.,* 299 F.Supp. 877, 890 (D.Conn.1969), *modified on other grounds,* 534 F.2d 422 (2d Cir.1975); *In re City of Bridgeport,* 129 B.R. 332, 334 (Bankr. D.Conn.1991).

Despite the Debtors' protestations, this is not an instance where the Trustee is seeking to sell property to ameliorate his failure to timely object to exemption claims, and thereby shift to the Debtors the burden of proof that he would have borne in an exemption objection matter under Fed.R.Bank.P. 4003(c). In point of fact, the Trustee does not object to the Debtors' exemption claim, and he is fully prepared to recognize their $1.00 claimed exemption interest in the Stock.

## B. Effect of Trustee's Failure to Object to Debtors' Claim of Exemption in the Stock.

▮ The filing of a joint petition under 11 U.S.C. § 302(a) creates an estate or estates comprised of, *inter alia,* "all legal or equitable interests of ... [each] debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The Bankruptcy Code permits debtors to exempt from

their estates certain interests in property. 11 U.S.C. § 522(b). Toward that end, the Code directs that "[a] debtor shall file a list of property that the debtor claims as exempt...." and that "[u]nless a party in interest objects, the property claimed exempt on such list is exempt." 11 U.S.C. § 522(*l*). Bankruptcy Rule 4003(b) specifies the time within which objections must be made to a debtor's list of exemption claims, to wit:

> The trustee or any creditor may file objections to the list of property claimed as exempt within 30 days after the conclusion of the meeting of creditors held pursuant to Rule 2003(a) or the filing of any amendment to the list or supplemental schedules unless, within such period, further time is granted by the court.

The Debtors' argue, on the strength of *Taylor v. Freeland & Kronz,* 503 U.S. 638, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992), *inter alia,* that because they claimed the entire *scheduled* value of the Stock (*i.e.* $1.00) as exempt, the Trustee's failure to object to the exemption claim revested them with title to the Stock by operation of law 30 days after the conclusion of their meeting of creditors. This Court does not read *Taylor* to compel the result urged by the Debtors. In *Taylor,* the debtor claimed as exempt the "Proceeds from lawsuit—v. TWA", *id.* at 640, 112 S.Ct. at 1646, and thereby laid claim, with fair notice, to *all* of the proceeds of such lawsuit *regardless of the actual and resulting value of such proceeds.* The instant matter, however, presents a subtle but highly material difference in the operative facts. The Debtors laid claim to only "$1.00" of the value of the Stock, which claim, absent amendment, would govern regardless of the actual value of the Stock. These differences are material because they serve to motivate a reasonable trustee, or other interested party, to distinctly different courses of action. Under *Taylor's* scheduling scheme, the trustee was fairly and reasonably on notice that his failure to object to the exemption claim could deprive the bankruptcy estate of the property's value in a open-ended amount. Under the Debtors' scheduling in this case, the Trustee had a reasonable expectation that the exemption claim could not deprive the Estate of more

than the liquidated amount stated, *i.e.* $1.00. *See Seror v. Kahan (In re Kahan)*, 28 F.3d 79, 82 (9th Cir.1994); *see also Mercer v. Monzack*, 53 F.3d 1, 3 (1st Cir.1995) (implying that property interests "not plainly" listed in exemption schedule are outside *Taylor's* holding). No doubt the disposition of this matter—and likely the Trustee's objection strategy—would have been different had the Debtors explicitly claimed as exempt "all", or the "full value", of the Stock.

If *Taylor* were read in the manner suggested by the Debtors under the facts of this case, it would impose a judicially-created deadline for a trustee to object to the *valuation* of property. No such requirement or deadline is found in the Bankruptcy Code or Rules, and this Court does not believe that the United States Supreme Court created one in *Taylor*.

The Debtors attempt to draw some support in this regard from an isolated statement in *Taylor*, to wit: that "[i]f [the trustee] did not know the value of the potential proceeds of the lawsuit he could have sought a hearing on the issue, see Rule 4003(c) ..." *Taylor, supra*, 503 U.S. at 644, 112 S.Ct. at 1648. While Justice Thomas' citation to Fed. R.Bank.P. 4003(c) seems to indicate that he is referring to a valuation hearing in the context of an exemption objection matter, it is critical to understand and distinguish the factual context in which such statement appears. A close reading of *Taylor* reveals that the trustee in that case did not object to the *nature* of the claimed exemption; *i.e.* he conceded that the debtor was entitled to

*some* exemption in the subject lawsuit proceeds. *Id.* at 642, 112 S.Ct. at 1648. The issue in such a case is whether the debtor's stated exemption claim to *all* of the proceeds falls within the exemption's monetary limitation, *i.e.* is the value of the property explicitly claimed entirely exempt equal to or less than the permitted dollar amount of the exemption? [2] Therefore, a valuation hearing would be required within Fed.R.Bank.P. 4003(b)'s deadline where, as in *Taylor*, it is necessary to value the property *in order to measure the exemption claim*. By contrast, when the objection goes only to the *nature* of the exemption claim, or when, as in the instant case, the exemption claim is to a liquidated monetary amount well *within the exemption's monetary limitations*, no valuation of property is implicated or required. Accordingly, the Debtors' reading of the above-quoted comment of Justice Thomas tortures his words well beyond their intended scope.

The Court acknowledges that at least one respected commentator apparently agrees with the Debtors that Fed.R.Bank.P. 4003(b) creates an implicit *valuation* objection deadline coextensive with its explicit *exemption* objection deadline. *See 8 Collier on Bankruptcy* ¶¶ 4003.03[1] (p. 4003–7), 4003.04[3] (p. 4003–14) (Lawrence P. King ed., 15th ed. 1994).[3] Yet for the reasons discussed here, and to the extent that the cited paragraphs cannot be harmonized with this ruling, the Court declines to follow such authority.

The Debtors also cite to several court decisions, *Allen v. Green (In re Green)*, 31 F.3d 1098 (11th Cir.1994); *Seifert v. Selby*, 125

---

**2.** The Supreme Court's opinion does not specifically identify the nature of the exemption at issue in *Taylor*; although it is clear from the context that it was of the type possessing a monetary cap as opposed to one exempting a stated item regardless of value. *Compare, e.g.*, 11 U.S.C. §§ 522(d)(11)(D) ("a payment, not to exceed $7,500 ...") with 522(d)(9) ("Professionally prescribed health aids ...").

**3.** *Collier's* language in the cited paragraphs is perplexing. On its face, the language of ¶ 4003.04[3], and to a lesser extent ¶ 4003.03[1] (cross-referenced in the body of ¶ 4003.04[3] ), seems incompatible with this Court's ruling. *Collier* concludes at ¶ 4003.04[3] as follows: Only when a debtor's schedules value the debtor's interest in the property at an amount higher than the amount claimed as exempt can it be

argued that a part of the debtor's interest in the property has not been exempted. In other words, the debtor's valuation of the property for exemption purposes must be accepted once the deadline for objections has passed. Otherwise, that deadline would be meaningless.
The scheduling paradigm illustrated by the instant matter (*i.e.* $x scheduled; $x claimed exempt) amply demonstrates the fallacy of *Collier's* conclusion that the debtor's valuation must be accepted or the exemption deadline would be "meaningless". Under such circumstances a debtor has achieved a far from "meaningless" result. She has in fact succeeded in realizing the full expectational value of her claimed exemption ($x), to the extent that she scheduled in good faith.

B.R. 174 (E.D.Mich.1989); *In re Okoinyan,* 135 B.R. 691 (Bankr.S.D.Fla.1991); *In re Syrtveit,* 105 B.R. 599 (Bankr.D.Mont.1989); *In re Snow,* 21 B.R. 598 (Bankr.S.D.Cal. 1982), which they believe fully support their position. However, this Court finds none of those decisions persuasive on the issues at bar.

The ruling in *Snow* is not in conflict with that arrived at here because it is factually and legally distinguishable. In *Snow* the debtor initially scheduled a value, and claimed an exemption, of $1500 for household furnishings which were destroyed by fire post-petition. The debtor had insured those household furnishings against fire loss at full replacement cost value. The debtor and his Chapter 7 trustee both claimed the replacement cost insurance proceeds over and above the unobjectionable $1500 exemption claim— approximately $18,000. Even though the debtor had only exempted $1500 of household furnishings, the court allowed the debtor the entire insurance proceeds attributable to the loss of such household furnishings, but not upon the theory espoused by the Debtors here. In *Snow* there was never any allegation or finding that the actual petition date value of the household furnishings exceeded the $1500 exemption claim. Indeed, the court felt that to schedule property at replacement cost in anticipation of an insurable loss would be to give those assets an inflated value contrary to both common sense and the Bankruptcy Rules. Although it is not clear if the *Snow* court viewed the replacement cost proceeds as a species of property distinct from the lost household furnishings, the court permitted the debtor to exempt the proceeds, presumably because it viewed those proceeds as somehow attributable to the household furnishings, *i.e.* as juridically the same as the originally exempted property.[4] Further, the debtor in *Snow* was not viewed as having gained a windfall through inaccurate or bad faith scheduling. As that court observed, "[e]xcept for having newer contents, [the debtor] will have no more or no less than before the fire." *Snow, supra,* 21 B.R. at 601.

The Debtors rely on mere *dictum* from *Syrtveit,* since the court there denied the debtor's claim of exemption on grounds unrelated to the issues at bar. In connection with an issue that court deemed "not necessary to decide," *Syrtveit* simply alludes to *Snow's* statement that "if property is listed on the claim of exemption, the debtor is entitled to the full value even if that value exceeds the market value placed on the schedule." *Syrtveit, supra,* 105 B.R. at 601. Therefore, for the reasons stated with regard to *Snow* in the preceding paragraph, this Court finds *Syrtveit* unpersuasive on the issue confronted here.

Admittedly, a blind application of the holding in *Seifert* would compel this Court to the conclusion urged by the Debtors. *Seifert* held that an entire real estate asset had been removed from the estate upon the trustee's failure to object to the debtors' claim of exemption to only part of their *actual* equity in the property. The basis for that district court's conclusion is not, however, particularized with great clarity. The *Seifert* decision has been criticized by a bankruptcy court in the same district, *First of America Bank v. Gaylor (In re Gaylor),* 123 B.R. 236, 238 (Bankr.E.D.Mich.1991) (stating that *Seifert* was "wrongly decided"); and even the opinion itself (on reconsideration) admits that a "contrary conclusion *may* be tenable". *Seifert, supra,* 125 B.R. at 176 (emphasis supplied). The *Seifert* court seems to have been motivated by an understandable desire to preserve the debtors' home. The debtors there had consolidated all of their available exemptions to apply to their home (*i.e.* their rights under a contract for deed). Any policy or equitable considerations that may favor preserving the Debtors' pre-petition interest in the Stock in this case are not of near the magnitude as those raised by an attempt to exempt one's home. Whatever the *Seifert* motivation, this Court declines to follow its

---

4. It might be argued that insurance proceeds are not the juridical equivalent of the underlying lost property; *i.e.* under certain circumstances a debtor's rights under an insurance contract may be an asset which is legally distinct from the property covered by that contract. Those contract rights may have to be separately scheduled and exempted, and a trustee's rights therein considered in light of 11 U.S.C. § 365(d)(1).

approach and conclusion. Moreover, even if *Seifert* is valid as a general rule, the specific facts here present significant distinctions warranting a different result.

The *Okoinyan* court recites none of its underlying scheduling facts. It is therefore impossible to determine if its holding is at odds with this Court's ruling in the instant case. At most, the *Okoinyan* opinion summarizes with approval the language of *Collier*, discussed *supra*. Thus for the reasons which this Court declines to follow *Collier*, it likewise finds *Okoinyan* unpersuasive.

At first blush the Eleventh Circuit's opinion in *Green* seems to present the greatest judicial challenge to this Court's ruling. That opinion was handed down on September 13, 1994—the day of the evidentiary hearing in the instant matter. The decision in *Green* was brought to this Court's attention by the Debtors through a pleading denominated "Supplemental Post-trial Memorandum" dated October 3, 1994, and filed with Chambers on October 4, 1994.

As in the matter at bar, the debtor in *Green* scheduled the value of the subject property—a lawsuit—at $1.00, and in turn exempted the full $1.00 of claimed value. The trustee did not object to the claim of exemption. The Court of Appeals affirmed the District Court, which had reversed the Bankruptcy Court, by holding that the debtor had successfully exempted the full value of the lawsuit, even if that value exceeded the $1.00 scheduled and claimed as exempt. Notably, the Eleventh Circuit viewed the factual record in *Green* as "materially the same" as that in *Taylor*. That assumption is critical in distinguishing *Green* from the matter at bar. Despite the fact that *Green's* scheduling scheme ($1.00 valuation ?? $1.00 exemption claim) appears qualitatively different from the scheme in *Taylor* ("unknown" valuation ?? "Proceeds", etc. (*i.e.* full value) exemption claim), the *Green* court viewed those schemes as not materially different because in *Green* the parties had *stipulated* that the debtor's $1.00 valuation was understood by all to indicate that the lawsuit's value was

"contingent" [5], not that it had an *actual* value of $1.00. In essence then, the trustee in *Green* conceded, despite the literal scheduling scheme presented, that he understood and treated that scheme as tantamount to an exemption claim of "full value". He was therefore fairly and reasonably on notice that his failure to object to the exemption claim could deprive the bankruptcy estate of the subject property's value in an open-ended amount. This is in stark contrast to the facts of the case at bar. Here, the Trustee vehemently maintains that he took the Debtors' scheduling quite literally when consciously foregoing an opportunity to object to the Debtors' attempt to remove from the Estate $1.00 in exempt property value. This reliance was justified, particularly in light of the Debtors' parenthetical statement, "liabilities vastly exceed assets", which made abundantly clear that they intended their $1.00 scheduling literally, and were not utilizing $1.00 equivalencies as jargon or shorthand, as in *Green*, to represent a *full* exemption claim to an asset of unliquidated value.

Even if *Green* is not distinguishable on its "stipulated" facts, it is important to note that the Court of Appeals there limited its analysis to an interpretation of *Taylor*; it did not provide a non-*Taylor*-based justification for the result achieved. Since the Eleventh Circuit has no direct precedential authority over this Court, this Court is free to interpret and distinguish *Taylor* as it deems appropriate. This Court has done so, and respectfully disagrees with any contrary conclusion expressed or implied in *Green*.

Instead, this Court allies itself with the philosophy of the judicial authorities cited by the Trustee. *E.g., Addison v. Reavis*, 158 B.R. 53 (E.D.Va.1993), *aff'd*, 32 F.3d 562 (4th Cir.1994); *In re Mercer*, 158 B.R. 886 (Bankr.D.R.I.1993); *In re Shoemaker*, 155 B.R. 552 (Bankr.N.D.Ala.1992). These post-*Taylor* cases are fully supportive of this Court's ruling because they premise their conclusions upon scheduling schemes which are, as a practical matter, indistinguishable from that at bar.

---

**5.** It is likely that the court actually meant "unliquidated", rather than "contingent"—which would literally mean that the existence of the value of the debtor's property interest was dependent on the occurrence of some future event.

The Debtors also argue that this Court's limiting of *Taylor* to its facts would violate the *spirit* of *Taylor*. That spirit, according to the Debtors, is to "increase finality, and to enforce a deadline to prompt parties to act." Although this Court agrees that through *Taylor* the Supreme Court sought to promote finality by strict enforcement of an exemption objection deadline, Fed.R.Bank.P. 4003(b), that it promulgated pursuant to the Congressional intent, *see* Sec. 522(*l*), this Court does not divine from *Taylor* a generalized emphasis on finality beyond those areas where the Bankruptcy Code and Rules establish explicit deadlines. A pure valuation deadline—which is what the Debtors are urging here—finds no tether to the Bankruptcy Code or Rules, and thus falls outside of the scope of *Taylor's* finality concern.

In a related vein, the Debtors urged the Court reject the position advocated by the Trustee because, they claim, that position subverts "finality" and "destroys debtors' fresh starts" by allowing a trustee to force a valuation hearing at any time during a bankruptcy case. The fundamental flaw in this argument is that it ignores the remedy which debtors possess to address this perceived injustice. Congress has provided debtors with the ability to compel a trustee to abandon property which is "of inconsequential value and benefit to the estate." 11 U.S.C. § 554(b).[6] A motion to compel abandonment can be filed at any time, and the Bankruptcy Rules put such proceedings on a relative "fast track" by specifically excepting such motions from the more cumbersome adversary proceeding procedure. Fed.R.Bank.P. 7001(1).

Finally, the Debtors argue that this Court's ruling would "punish" a debtor who makes a good faith attempt to value his assets since, they contend, it would create an incentive for an unscrupulous debtor to place no liquidated values in the schedules and explicitly exempt "full value". The Debtors'

reasoning is flawed in several respects. First, debtors are required to prepare their bankruptcy schedules in good faith. The fact that another debtor may gain a perceived windfall by deviating from good faith scheduling does not "punish" a good faith debtor; he is simply doing no more or less than the law requires. Second, the Court disagrees that its ruling establishes a substantial incentive to make exemption claims at "full value". In light of *Taylor,* such "full value" claims are sure to draw an objection or prompt the filing of an objection extension request. The Court can fairly assume that the full import of *Taylor* has been appreciated by trustees, and their liability insurers and bonding companies. Finally, even assuming that an incentive toward bad faith scheduling were created by this ruling, that fact is not a legitimate basis for a contrary ruling. Failure to schedule in good faith is illicit conduct which is sanctionable criminally and civilly. *See, e.g.,* 18 U.S.C. § 152 (criminal penalty for concealment of property from trustee, and for false oaths, declarations, statements and verifications); 11 U.S.C. §§ 727(a)(3) (denial of discharge for concealment of property from trustee) and (4) (denial of discharge for false oaths and accounts); Fed.R.Bank.P. 9011 (sanctions for signing of schedules known to be not well grounded in fact). As with all illicit conduct, there is an incentive to engage in it; otherwise, it would be unnecessary for society to structure legal deterrents to it. At worst, this Court's ruling builds in a incremental[7] incentive to engage in illicit scheduling activity. The remedies for that situation are the sanctions already existing in the body of law.

In view of the foregoing, as regards their *exemption interest* in the Stock, the Debtors are entitled to no more than $1.00, absent, of course, legitimate amendment of Schedule C. This determination, though, does not resolve this matter because, depending upon the value of the Stock on the Petition Date, the

---

6. Even if the court denies a debtor's motion to compel abandonment because it determines that the subject property has a consequential value for the bankruptcy estate, the motion can aid the debtor by forcing a trustee to be responsible and expeditious in his marketing of the property. For example, the court may decline to compel

abandonment, but be convinced to impose a deadline for the marketing of the property.

7. Even absent this ruling, there exists a substantial incentive toward illicit scheduling to hide assets, qualify for relief under certain chapters, manipulate venue, etc.

712

Stock *may* have revested in the Debtors by operation of law, and thereby be unavailable for sale by the Trustee. Stated differently, this Court must next resolve the factual question of whether the Stock had a value in excess of $1.00 on the Petition Date. If it did, the Trustee clearly has an interest to sell, over and above the Debtors' exemption interest. If, however, the value of the Stock on the Petition Date was $1.00 or less, the Court must confront the legal question of whether property exempted to its full petition date value automatically revests in debtors upon the passing of the exemption objection deadline. That legal determination is unnecessary in this case since, as discussed in Section V, Part C of this Memorandum of Decision, *infra*, this Court finds that the Petition Date value of the Stock exceeded $1.00.[8]

## C. Nature and Value of the Stock on the Petition Date.

■ In assessing the Petition Date value of the Stock, it is important to understand the precise nature of what is being sold by the Trustee. Although Gateway's offer of $10,000 is nominally for the Stock, what it really seeks to purchase is *control* of C.A.M.R., Inc. Presumably Gateway would pay the same price for 51%[9] of the Stock as it would for 100%.[10] The parties agree that C.A.M.R., Inc.'s Petition Date liabilities exceeded the fair market value of its "hard assets" by at least $1.2 million. Thus, for the Stock to have had a positive net worth or "book" value on the Petition Date, absent factors not in evidence in this matter, the value of C.A.M.R., Inc.'s Claims against Gateway must have exceeded $1.2 million.

The Court heard no evidence regarding the Petition Date value of the Claims. Accordingly, there is no basis from which the Court can find or infer that those Claims had sufficient merit to render C.A.M.R., Inc. solvent under a strict balance sheet analysis. Neither is there any evidence before the Court indicating the existence of any "enterprise" or "going concern" value in C.A.M.R., Inc.

The "control value", if any, inherent in the Stock on the Petition Date could have arisen only through Gateway's recognition (1) that it would be delayed in its effort to foreclose upon The Atrium and convey the same to an interested purchaser, and/or (2) that it was exposed to a not insignificant monetary risk in litigation, either through setoff of the Claims or invalidation of all or part of its mortgage debt on The Atrium by virtue of the Defenses.

As of the Petition Date, it appears that Gateway was proceeding with what it believed was a relatively uneventful commercial real estate foreclosure on The Atrium. It had obtained the appointment of the Receiver and received no real defense from the Debtors or C.A.M.R., Inc. There is no evidence from which this Court can find that, as of the Petition Date, Gateway foresaw the subsequent pendency of the Appeal or the assertion of the Claims and Defenses. Likewise, it appears that neither the Debtors nor C.A.M.R., Inc. knew of the factual basis for the Claims and Defenses on the Petition Date.[11] Yet, even if they had knowledge of such facts, it is clear that they had not brought them to the attention of Gateway at that time. Therefore, on the Petition Date,

8. While not essential to the disposition of this matter, the Court notes that despite an apparent majority view favoring revesting of fully exempt property upon the expiration of the exemption objection period, this result is by no means compelled by the language of the Bankruptcy Code. *See Hyman v. Plotkin (In re Hyman)*, 123 B.R. 342, 347 (9th Cir. BAP 1991), *aff'd*, 967 F.2d 1316 (9th Cir.1992).

9. This percentage depends, of course, on the level of majority prescribed by the C.A.M.R., Inc. articles of incorporation and/or by-laws for the type of corporate activity contemplated by Gateway.

10. Upon the present record, it is also apparent that, given adequate notice and information, Gateway was destined to be the successful bidder for the Stock. This is true because the only other parties interested in purchasing the control value would be those bidding with a view toward "reselling" that control to Gateway. Gateway has no logical use for "middlemen".

11. This is not to say that the factual basis of the Claims and Defenses did not exist on the Petition Date. To the contrary, a substantial portion of the improper conduct ascribed to Gateway allegedly occurred pre-petition.

Gateway did not *fully* appreciate the delays and risks inherent in the Foreclosure Action.

Nonetheless, to acknowledge that Gateway did not *fully* appreciate its risks in litigation with the Debtors and C.A.M.R., Inc. on the Petition Date does not imply that control of C.A.M.R., Inc. was of no value to Gateway at that time. It would be illogical for this Court to conclude that Gateway had *no* interest in control of C.A.M.R., Inc. on the Petition Date. At the very least, Gateway would have been interested in insuring an uneventful and efficient foreclosure of a major real estate asset. To suggest that the value of such "insurance" was $1.00 or less is nonsensical, and is to ignore the commercial and litigation realities attendant to any major real estate foreclosure. *See Norwest Bank Worthington v. Ahlers (In re Ahlers)*, 485 U.S. 197, 208, 108 S.Ct. 963, 969–70, 99 L.Ed.2d 169 (1988) (recognizing the existence of "control value", even in the absence of "book" and "going concern" value). In the unlikely event that extraordinary facts were present sufficient to alter the logic of this conclusion, the Debtors have failed to meet their burden of proof to establish such circumstances.

Accordingly, the Court finds that the Stock possessed a value in excess of $1.00 on the Petition Date, and as a result, the Stock has not even arguably revested in the Debtors. The Court declines to precisely quantify the Petition Date value of the Stock since such determination is unnecessary to the overall disposition of this matter.[12]

**D. Impact of the Debtors' Alleged Post-petition Activities.**

The Debtors claim that any value the Stock may possess over and above its Petition Date value was created through their postpetition efforts and earnings. They argue further that because those efforts and earnings do not constitute property of the estate, the product thereof, *i.e.* the postpetition increase in the value of the Stock, is likewise not property of the estate and cannot be sold by the Trustee.

The Debtors correctly understand and state the law which would apply to the facts which they allege. A trustee may not retain for the benefit of a bankruptcy estate property which has been created postpetition through the efforts and investment of a debtor.[13] *See* 11 U.S.C. § 541(a)(6). However, in view of this Court's finding that the bankruptcy estate has an interest in the Stock due to the presence of non-exempt value on the Petition Date, even if it found that all postpetition increases in value accrued by reason of the Debtors' postpetition efforts and earnings, the Trustee would still have an interest in the Stock to sell, and he would not be disabled from doing so. Therefore the balance of the discussion in this section is provided simply toward the resolution of whether, and to what extent, the Debtors are entitled to *proceeds* of the sale of the Stock over and above their $1.00 exemption interest therein.

For the Debtors to prevail in establishing a non-exemption interest in the proceeds of the sale of the Stock to Gateway, they must convince the Court by a preponderance of the evidence that postpetition value was created through their *bona fide* postpetition effort and/or earnings. The Debtors have not sustained their burden on this issue.

The parties stipulated to the following facts germane to this inquiry:

1. In prosecution of the Appeal, from the Petition Date to September 27, 1993, *Debtor Richard DeSoto and C.A.M.R., Inc.* in-

---

12. Such estimation would be largely guesswork due to the paucity of the present record.

13. The limits of this concept are illustrated by the following hypothetical example: On the petition date a debtor owns in fee simple a parcel of vacant land, all of which has been claimed as exempt. If the debtor thereafter erects a home on the parcel utilizing her own labor and/or funds earned post-petition, the trustee may not sell any portion of the real property. By contrast though, if the property was originally an im-

proved parcel, and acquired its postpetition increased value through market appreciation, and not through the efforts of the debtor, the trustee may well be entitled to sell and retain the value over and above any appropriately claimed exemption. *See e.g., Hyman v. Plotkin (In re Hyman)*, 967 F.2d 1316, 1321 (9th Cir.1992); *Schwaber v. Reed (In re Reed)*, 940 F.2d 1317, 1323 (9th Cir.1991); *In re Paolella*, 85 B.R. 974 (Bankr.E.D.Pa.1988).

curred obligations to the law firm of Bieliz-na, Frizzell, Papazoglou, Olivo and Swenson in the amount of $8,198.50, of which sum $7,298.50 remains due and owing.

2. *C.A.M.R., Inc.* has incurred obligations to Attorney Robert A. Ziegler in the amount of $19,465.25 in connection with its assertion of the Claims and Defenses, of which sum, $9,000 has been paid.

Stipulation at ¶ 21 and 22 (emphasis supplied). Neither of the Debtors testified at the hearing of this matter, and the Court heard argument, but no evidence, of a causal link between the stipulated legal services and expenditures and the timing and/or amount of the Gateway offer for the Stock.[14] Thus, while it is uncontroverted that Debtor Richard DeSoto incurred and paid legal fee obligations in the relevant time frame, *i.e.* post-petition, the Debtors have fallen woefully short of providing this Court with a factual basis to support their claim that such expenses were the engine creating any postpetition increase in the control value of the Stock.

An additional aspect of the evidentiary record merits comment. The Court was presented with documentary and testimonial evidence sufficient to find that Debtor Richard DeSoto was attempting in May 1993 to exploit for his own personal benefit the inertia and/or monetary exposure which Gateway faced in the Foreclosure Action. The Court notes that these efforts were undertaken by Debtor Richard DeSoto at a time when the Stock was, even under the Debtors' argument, still property of the bankruptcy estate since the Debtors' Fed.R.Bank.P. 2003(a) meeting was still "open", and thus the deadline for exemption objections had not passed.

The Debtors summarize their argument by stating that Gateway is paying a "nuisance value", and that Debtor Richard DeSoto was the "nuisance". In this regard the Court notes again that, even under the Debtors' argument, title to the Stock, and thus control of C.A.M.R., Inc., remained in the Trustee until July 30, 1993 at the earliest, *i.e.* 30 days

after the stipulated conclusion of the Fed. R.Bank.P. 2003(a) meeting on June 30, 1993. Therefore the prosecution of C.A.M.R., Inc.'s Appeal and the assertion of the Claims and Defenses were within the legitimate and ultimate control of the Trustee until that time. Stated in the more crass terms used by the Debtors, the right to be a "nuisance", and be compensated for it, belonged to the Trustee. At best, Debtor Richard DeSoto unknowingly and illegitimately attempted at his own peril to convert the bankruptcy estate's opportunity in this regard. At worst, he consciously pursued such a course of action with knowledge of the Trustee's preeminent and competing interest. Neither scenario should be indulged or rewarded by the Court.

In light of these findings the Court concludes that even if the Debtors had carried their burden of proving a causal connection between the stipulated legal expenses and any increase in control value, it would be inequitable and contrary to the spirit of the Bankruptcy Code to reward the activities of Debtor Richard DeSoto. In essence, this Court would find that such activities were taken in bad faith vis-a-vis the bankruptcy estate, and would refuse to give such efforts effect under 11 U.S.C. § 105(a), *inter alia.*

### E. The Sale as a Fraudulent Conveyance.

At oral argument Debtors' counsel articulated an additional theory allegedly barring the Trustee's sale of the Stock to Gateway. The essence of the argument, as the Court understands it, is that by enabling a distribution to the creditors of the Debtors from the proceeds of the Stock, a fraudulent conveyance of C.A.M.R., Inc.'s Claims will be effected, to the detriment of C.A.M.R., Inc.'s creditors. On that basis, this Court is urged to somehow restrain or enjoin the sale of the Stock. This argument was not the subject of any written briefing, either before or after its articulation at hearing; and the Debtors have not cited the Court to any case law or other authority supporting their theory.

---

**14.** Even if causal link evidence had been adduced, it would have been efficacious, if at all, only as to the legal expenses incurred for the Appeal. This is true because the Stipulation reveals that the legal fees for the assertion of the Claims and Defenses were incurred and/or paid by C.A.M.R., Inc. alone.

The Court does not subscribe to the Debtors' initial premise, *i.e.* that the sale of the Stock could effect a fraudulent transfer of the property of C.A.M.R., Inc. What is proposed to be sold here is the Stock. The Stock is owned by the Debtors, and in the context of this bankruptcy case, it is their creditors who are entitled to the proceeds thereof. Undoubtedly, under the unique circumstances of this sale, the vendee—Gateway—will utilize its ownership of the Stock to nullify the value of C.A.M.R., Inc.'s Claims. However, such nullification occurs not as a natural result of the Trustee's conveyance of the Stock, but as a consequence of the subsequent and independent actions of Gateway in pursuing its unique agenda.

It is, however, unnecessary for the Court to finally determine if the Trustee's proposed sale effects a fraudulent conveyance since, even if that were the case, the Court's proper role is to decide the matter before it under applicable law, not to serve a prophylactic function inconsistent with an otherwise appropriate disposition of the matter before it. Of course, the refusal of this Court to act in a prophylactic manner does not itself prevent a future challenge in an appropriate forum by C.A.M.R., Inc.'s creditors or their representative of the propriety of alleged fraudulent conveyances.

### VI. CONCLUSION

For the foregoing reasons, the Debtors' Objection to the Trustee's October Notice of Sale must be overruled. Accordingly, the Trustee's sale of the Stock proposed in the October Notice of Sale shall be approved; and he may proceed to consummate the sale, but shall account to the Debtors for their $1.00 exemption interest in the Stock from the proceeds thereof.

The foregoing Memorandum of Decision shall constitute this Court's Findings of Fact and Conclusions of Law for purposes of Fed. R.Bank.P. 7052.

### ORDER ON OBJECTION TO NOTICE OF SALE

For the reasons stated in this Court's Memorandum of Decision dated May 15, 1995, the Debtors' Objection to the above-captioned Notice of Sale is hereby OVERRULED; and the Trustee's sale of the Stock proposed in the above-captioned Notice of Sale is APPROVED; and

IT IS FURTHER ORDERED that the Trustee may proceed to consummate the sale proposed in the above-captioned Notice of Sale, but shall account to the Debtors for their $1.00 exemption interest in the subject stock from the proceeds thereof.

SO ORDERED.